May it please the Court, Cheryl Gordon-McLeod on behalf of Mr. Chaggar. All right, we have both here. We've got your appeal and we've got a cross-appeal by the government, correct? Correct, and the clerk asked me to announce at the beginning our proposed order of argument, which is that I would open with appeal issues. The government would go on with appeal issues and cross-appeal issues. I would respond and reply on all issues, and then they would get the last word with their cross-appeal issues if that's acceptable to the Court. All right, and you basically have 20 minutes total. That's my understanding. Nineteen and a half now. We'll give you 20. We'll put back the 20. Thank you, Your Honor. Good. All right. This is the case in which credibility was the key issue. It was the case that the district court specifically said was a close case.  And he said that the facts to convict were there, but just, quote, barely so. And it's in that context that I want to discuss the appeal issues. I'll focus on the vouching issue and also the Brady-Napoo issue. To begin with the vouching issue, the government's elicited testimony, vouching for the credibility of Ms. Vartiya, the single informant witness on whom its entire case rested. It elicited this testimony from Detective Leininger, the DEA agent. And when it elicited the testimony of Ms. Vartiya, the DEA agent, and when it elicited Wouldn't your argument be stronger if this were not a court trial? Well, I think that's a question that goes to prejudice. Certainly, if it went to the jury, we could say the jury doesn't know the law and so they might have relied too much on it. But this is a bench trial, and we actually have some comments from the district court that we can look at to see if this might have had an effect. And the comments I refer to are the ones in ER 305 where the district court talked about its findings in this case. And that was where the district court said the facts were there to convict but, quote, barely so, that it was, quote, a very close case, that he, quote, struggled mightily with it, and in which he specifically said that he rejected the government's aggravated version of the case. So in a sense it might be stronger I missed some of your words. It rejected the government's what version of the case? The district court rejected the government's version in which the government said it was a very aggravated crime. Oh, okay. Instead, the district court specifically said it's not as aggravated as the briefing beforehand would have shown. And that's in ER 305. So, sure, with a jury trial they're not presumed to know the law, but here we know exactly what the district court was thinking. And in addition, we know that credibility was the key issue, and the error of vouching that I'm talking about went specifically to credibility. And we know from cases such as Weatherspoon and Sanchez-Lima that when credibility is the key issue and there's vouching, the government placing their thumb on the scales, it's the worst case. In terms of what the vouching specifically was, we have the comments from Agent Leininger and we have the comments from Gosal, who was Vartiya's attorney. The Leininger comments are especially bad because he doesn't just say I, D, E, A, Agent Leininger, think that Ms. Vartiya is telling the truth. He's the one who said that we met out on the steps in front of the jail and me, the two DEA agents, the ICE agent, and the AUSA, quote, unanimously decided, close quotes, that Ms. Vartiya was telling the truth. And that's in the ER at 103. I know the government has argued in its response that this was unintentional. It never meant to elicit that. But if you go on in Detective Leininger's testimony to the next morning, the morning of April 6th, the government does it again. And this is in the April 6th transcript at page 33. I miscited this in my opening brief, and that was the reason for the supplemental excerpt of record that I submitted when I walked in today, which has the correct pages. It's page 33 of that April 6th transcript, and that's where the government asks Leininger again about Ms. Vartiya's credibility. And in response, DEA agent Leininger says, I don't think she was being deceptive. I believe in her eyes she explained it clearly. And that's a quote. So we have the Leininger problem, and then we have the Mr. Gosal problem. This was the lawyer for Ms. Vartiya. And this is the one from whom the government specifically elicited his opinion of his client's credibility. And in response, he said, I completely believe in her. I subjectively believe in her. I absolutely believe in her. And, in fact, I need to monitor her testimony because I can't put her on the stand if she was going to lie. Then we have closing argument. And if you take a look. I couldn't something about her lying. I have to monitor her testimony because I can't put her on the stand if she's going to lie. And that's in the ER 93 to 96, I believe, at page 96. But kind of, if you want to get to the gist of this, okay, it is a court trial. Correct. And no judge is going to find someone guilty if they don't think that the people have been, that the charges have been proven beyond a reasonable doubt. Correct. All right. The next thing is, basically, when the actual, the important part of this here, your client was there, Vartiya was there, and there was an assistant to your client that was there, correct? Correct. And then, and I guess then there was also a monitored phone call, which was introduced into evidence. But that wasn't particularly damning one where it, you know, I mean, there were arguments made both ways. I think you're referring to the face-to-face meeting that was taped at the jail. Right. Yeah. But essentially, the judge has to decide, you know, what happened in that particular incident. None of the officers were there. Vartiya's attorney wasn't there, anything like that. And, you know, actually, judges every day believe or disbelieve officers, believe or disbelieve lawyers, you know, that type of thing. So, I mean, the real focus of the case is what those three people testified to and what happened there. So, and it being a court trial, and as judges training, I have a, I have a, it's hard for me to believe that that did anything more than go in one ear and out the other, what other people thought. Judges know that it's really what, what do I think is the trier of fact and the law. Well, we can presume that if there's nothing in the record to dispute that. We can presume the district court knew the law if there was nothing in the record to dispute that. But there is. What, Leininger was questioned, asked the question about whether he thought Vartiya was being deceptive. Objection, overruled. This is in the two pages that I gave to you this afternoon. Gosal was being questioned about whether he thought that Vartiya was being truthful. Objection by defense counsel, overruled. So although there's generally a presumption that it might go in one ear and out the other if he's not supposed to listen to it, we have two things on the record that explicitly rebut that presumption. The judge overruled the objection. And I don't know how much more explicit you can get than that to show that the judge was crediting and believed was admissible these statements about other people believing that Vartiya was telling the truth. So let me turn to the case. The judge said he was struggling mightily to decide whether your client was guilty or not guilty? That's correct. That's in the ER at 305. He said that at the sentencing when he was describing, when he was explaining the low sentence that he gave. Oh, he still gave. Let me comment on that. It seems to me he has to make that decision, as Judge Callahan says. That's his decision, who to believe. And once he decides, the accuser is telling the truth. It's not a close case. It ceases to be close once he believes it. So make that a reason to go down on sentence. It's ridiculous. The case is your client is conspicuously guilty once he resolves the credibility. Let me take your question as going to both the vouching issue and the sentencing issue. As to the vouching issue, certainly the district court had to decide who to believe. But in a question where who to believe is critical and is, in fact, the only case, and where Vartiya has this history of lying to the government, and the agents and the lawyer testify that she was being truthful and the judge's overruling of the objection indicated that he was taking into consideration their testimony, that's the government placing the thumb on the scales and influencing the district court's decision about whether to believe her. I believe your question was the same. Well, that's your argument. That's an argument, not a very strong one, but it's an argument. But I really find it hard to believe an experienced judge, as this judge was, would have paid any attention. He's quite experienced, but he overruled two objections, and he was incorrect in doing so. Well, he is. Let me go on. So when he expressed this doubt about his, you said this was a very hard case for him to decide. What were his words again? He said the facts are there to convict, but, quote, barely so, unquote. Quote, I struggled mightily, close quote, with this case. And, quote, it was a very close case, close quote. And it's not as aggravated as the pretrial briefing would have led me to believe. Those were his comments about it. So those comments, in your mind, add up to the judge really having a reasonable doubt? No, Your Honor. I'm not arguing that he had a reasonable doubt. I'm arguing that this is a case where vouching and where the other error, the Brady and Knapp, whoever, matters, because he found it close. He made a decision, but he found it close. It's the close cases where vouching matters, not the cases where there's overwhelming evidence. Well, I was a trial judge for many, many years. You know, if I had to struggle, I knew then I had a reasonable doubt. And as a trial judge, I'm sure you would have made the correct ruling when the government sought to introduce improper evidence that would have tainted your decision. That's the opposite of what the district court judge did here. Well, I don't know about that. But when you struggle mightily, that tells me that, because to me, reasonable doubt means practically certainty like the English do. They tell the jurors, to convict so-and-so, you must be convinced of his guilt beyond a reasonable doubt. That means you must be sure. And reasonable doubt, to my mind, is near certainty. But that's something the law professors can talk about. Well, I don't disagree with you, Your Honor. I guess my point is that there was some extra improper evidence there pushing him over on that, according to this transcript. Let me touch for a moment on the Brady and Napu issue. And this is the fact that the government elicited from Ms. Vartiya the fact that she expected no benefit at her own sentencing from testifying against Mr. Chagar in his witness tampering trial. So you're not contending that the government withheld any particular documents. Your contention is your arguments that the government gave the impression that Vartiya would not benefit further from her cooperation with the government. Correct. Am I focused on your argument, then? That's what I'm focused on, Your Honor. And then if that is your argument, then how is that a violation of Brady? Well, it's a violation of Brady and Napu both if there's some material falsehood that's been withheld or suborned or something. So what did they withhold? Well, the fact that there was an implicit understanding. The government is arguing there was no explicit deal, so there was nothing to reveal. And then on the other hand, the government is arguing any fool could plainly see that there was a likelihood that something good might happen at sentencing, so the fact that nothing was revealed about it can't be harmless. Obviously, there is some tension between those two positions. I think what we need to look at is whether implicit agreements as opposed to explicit agreements count, whether expectations of leniency count. And under the case law, I think that the answer is yes. Reuter v. Solem, the Eighth Circuit case that I cited, says even upcoming opportunities for leniency have to be disclosed. The cases that I liked best that are in the brief are from this circuit, U.S. v. Schaeffer, a 1986 case. That was the case where the drug-dealing defendant miraculously got to hold on to a bunch of assets that were forfeitable. There was no explicit deal made with him, but this Court found that the failure to disclose that he was holding on to potentially forfeitable assets indicated the possibility of an implicit agreement and caused reversal. But, okay, there's an action there. You know, he's got property. We're talking in Fartia's mind, right? Well, we're often talking about that, and we look at the transcripts to decide. We've got a transcript of the trial where the government is questioning her, and he says, are you expecting anything good at sentencing? And she says, yes, from my drug case, quote, my drug case. What about this case? Oh, this doesn't count. This was just out of the blue. And then in argument, the government argues to the judge, she didn't expect anything at her drug case. She had a 5K in the bag already. Well, six weeks later, we go to Ms. Fartia's sentencing hearing. It takes six pages of transcript and the transcript that we submitted, and about five of those pages are about her actions in testifying against Mr. Chigar. So either the government was wrong when it elicited from Ms. Fartia that the drug, that her testimony at her trial had nothing to do with her sentencing. Well, there's no other either. If implicit promises and expectations count, then the contrast between what the government elicited in the Chigar trial and argued and her sentencing could not be more stark. Your Honor, whatever remaining time I have left, I'm going to try to save. Thank you. May it please the Court. I'm Todd Greenberg for the United States. Let me correct the record in a couple ways with respect to the Brady claim. First of all, despite the claims here today and in the briefs, Senita Fartia never testified, never denied that she was going to testify. In fact, there was the defense at trial thought the issue was confused, so they crossed her on it. And her testimony was, quote, ended up being, quote, I have no idea if this is helping me or not. That's her subjective understanding. She was a 20-year-old girl. She had never been arrested before, and here she is arrested and facing prosecution in a foreign country. She didn't understand the full gamut of her cooperation. Now, that's the first point. She never testified falsely. She admitted she was going to get some sort of deal about the drug part of it, but it was about testifying at Mr. Chigar's trial, right? And she didn't deny any that she might get a benefit. She said she didn't know. See, this is a 20-year-old girl who was cooperating on a drug case. She saw herself as a cooperator on a drug case. She was then threatened and railroaded by this attorney. She was a victim of a crime. She reported that crime like any other crime victim, and it sounds like, based on the record, in her mind, she was cooperating on the drug case. She was victimized in this case. Now, when pressed on that on cross-examination, for example, well, it says in your own pre-sentence report right here, as it did, that you are going to get a benefit because you're testifying against Mr. Chigar. She said, you know, I really don't know if this is helping me or not. Now, that's not false testimony. It would have been improper if, as trial counsel, I argued to the court, she'll never get a benefit for this, so she's got no bias in this matter. Of course I didn't do that. It would have been preposterous to do that. Her sentencing was a few weeks later before Judge Kuhnhauer. What I argued was simply that she didn't have a motivation to make up a story in order to get a downward departure at sentencing. She was facing a 10-year mandatory minimum sentence. The defense might argue she needed something to give the government to get out from under that. She didn't need the Chigar story here because she was already cooperating on the drug case. So she was going to get a 5K if she kept doing that, and she would have known that. So the argument that we made at trial is that it would have been absolutely unnecessarily risky for her to have made up this story about Chigar to feed to the government when she already had a cooperation benefit coming her way. And the court knew full well that she was likely to get a benefit from her testimony because the pre-sentence report said it. That pre-sentence report was before the court. I produced it to the defense well in advance of trial. They used it to cross-examine her and quoted from it. It was very clear and open to the law. It was going to be the same judge. It was the same judge. Yes, Your Honor. Yes, Your Honor. He presided over it. The judge who heard this part was going to also give the sentence. Yes, Your Honor. Right? Yes. It would have been impossible and preposterous for me to have tried to deny that she was going to get some credit for something and then four weeks later have the government walk into court before the same judge and say give her credit for this. And, of course, I wouldn't have and didn't do that. With the court's permission, I'd like to turn to the issue. Johnny, do you concede the lesser included offense issue that he can't be convicted above? Your Honor, I don't concede it only because I think it's very unclear whether the misdemeanor was a lesser included offense. There's some dicta in the circuit that suggests it might be. There's no case that holds it is. And I think on a plain error standard, because there was no objection below, I'm not sure that there was any prejudice at all to Mr. Chagger as a result of the conviction. So whether it's a lesser included offense, I just don't know, but I don't think that he was substantially prejudiced by the conviction. Well, I'm looking at Rutledge v. U.S. that holding it were two statutory provisions prescribed the same offense, the legislature does not intend to impose two punishments. So, you know, to me it appears that the lesser should be vacated. Well, and I'm not sure that they're the same offense because one defines witness tampering in Section B, 1512B, and the other defines witness harassment. And there is a separate definition for the term harassment under the law, even under the circuit. I provided both of those elements for both crimes to the court in my pretrial brief. Whether technically one is a lesser, I just don't know. But, again, I don't think that we have plain error here because there's no prejudice to Mr. Chagger. But, of course, I also don't see it as the central issue in the case. Did you research that? I did, Your Honor. In fact, I researched it pretrial. All of the law that's cited in my response brief was provided to Judge Kuenhauer in advance of trial because, in fact, I was preparing jury instructions for the case. And then I converted that to a pretrial brief. So, yes, all of this law was researched by me in advance of trial. The same cases that are cited here provided to Judge Kuenhauer in advance of trial, and he had that before him. Well, if you commit the greater, do you necessarily commit the lesser? I don't – the way I read it, no, because the definition of harassment requires different actions than is required for the witness tampering. Well, I mean, tampering with a witness is the greater, right? Well, it's certainly the felony. All right. If you tamper with a witness, have you harassed that witness or not? From a layman's terms, sure. From legal terms, defining these terms, I don't know. Not necessarily. I mean, you could tamper with a witness by talking to the witness's best friend, spouse. I just – yes, Your Honor. I think you can. My answer is I don't know. Interesting. You used the word gamut earlier on. Sorry, Your Honor? Gamut. Did you use the word gamut? I don't think so. Okay. Possibly. It's unclear, as I submitted to Judge Kuenhauer in advance of the trial, it's not clear if these things are lesser-included offenses, one from another or not. But with the Court's permission, I'd like to turn to the sentencing issue. I think that is the meat of this case. Where is this witness now? Sen. Vartiya? Yeah. She served her sentence, and she's living back in Canada. She served her 15-month sentence. And the appellant here is serving his, or is he out yet? Well, Your Honor, I believe that he's just finished his sentence and is in immigration custody now, awaiting release from the United States. But let me turn to the sentence because – Is there some provision – excuse me. Is there some court order restraining him? Suppose we sent this back for resentencing. What will keep him here? Your Honor, there's no – You haven't asked for an order, but how are you going to keep him here? Well, I'm not – If he has to be resentenced. I'm not sure I'm going to be able to, Your Honor. He has served his sentence. Why don't you ask the court? Well, I may need to do that. Why don't you ask the court? I should think you might think about it. I may do that, Your Honor. You don't want to let him go if he needs a larger sentence. Well, I'm well aware of that, Your Honor. I made efforts throughout this case to detain Mr. Chagger. Well, did you go into Judge Kuhnhauer and say there's an appeal on your sentence? Well, we litigated the issue of detention at several levels before Judge Kuhnhauer, including the issue of they asked for release pending appeal. And at that point, Judge Kuhnhauer denied their motion and gave him a reporting date. So I have not gone back to Judge Kuhnhauer since that time, no. We look very foolish. Should we send him back for resentencing? I think he's already off in Canada or somewhere. Well, Your Honor, I appreciate that, and I may very well take this court's suggestion to heart. And I do ask this court, Your Honor, to find that the sentence was unreasonable. Why not just do it? What do you have to think about? Well, I'll ask the court right now to impose an order to detain Mr. Chagger and prevent him from No, no, think about just letting him go because he's already served his time. Well, because the sentence he received, Your Honor, was insufficient and unreasonable. This was an attorney from Canada, an officer of the court, who is convicted of tampering with a witness and used his bar card to enter a federal prison to tamper with this witness. The court's sentencing guideline calculations found that not only did he commit this crime, but that he abused his status as a lawyer to commit the crime, and that his intent in committing the crime was to obstruct a criminal investigation or prosecution. Those are express findings under the guidelines that this court made. The starting point for the sentence under the sentencing guidelines was 97 to 121 months. That's just over 8 years to 10 years. Well, I'm inclined to agree with you on a point here that I think here, his being an attorney seems to be an aggravation as opposed to a mitigation in the context of the way that the judge said it. But couldn't the judge say there would be a way that – and I also think the fact that it was a closed case doesn't matter anymore once someone's convicted. They're convicted of the offense, so that doesn't help them out. Where it could help someone out is, say, for example, you have no prior record, you have clients that say that you've been a good attorney otherwise, other than you have character witnesses otherwise that speak to you, and also that even though it was a closed case, I don't think that matters once you're convicted. But the facts can be either more or less aggravated, and one of the things the court could perhaps – I'm aware of some of the arguments that the government made in terms of Mr. – I don't know, did we say Chagger? I said Chagger, Your Honor. I don't know. But some of – that he had other affiliations that apparently the court did not buy into that, and the court felt that it was not as aggravated. Although he was guilty, it was not as aggravated. Now, let's just say that you win the battle here and it goes back. Couldn't the judge, using the other arguments that I'm saying, still get to the same place? Not if the Zavala case stands for anything. Well, and I wanted to ask you about – we don't know what Zavala – well, Zavala is not final at this point, so. Well, I understand. But not if any of these cases stand for – really mean anything, because when you have a starting point or whatever you want to call it of 8 to 10 years, and you end up 88 percent below that, call it a departure, deviation, whatever it is, movement, you better have good reasons as an appellate court to uphold that extent of the movement, or else there is no guidance being given to the district court. And in this case, not only the reasons the district court cited, but just looking at the record independently, there is not sufficient evidence to support that kind of mitigation here. Now, is there some sort of movement away from 8 to 10 years that may have been reasonable? That's possible. How do you know there's no evidence to support that mitigation? Well, Your Honor, I'm – You've got a conscientious judge. He tells us he struggled. He found the guy guilty. He has to impose a sentence. He's thinking about it. He knows who he has before him. He's heard all this. You know, I don't know why a year and a day isn't – if he thought so, wouldn't be sufficient punishment. Well, Your Honor, with all respect, because that's not the law. Just because Judge Kunauer – and I'm sure he thought about this carefully. I know he did. But just because he thought about it and decided that a year and a day was the appropriate sentence, that doesn't make it so. Well, obviously, there's – reasonable has to mean something. Yes. So somewhere along the line, there's got to be a sentence out there that's not reasonable that – well, obviously, but we're not talking statutory minimum and statutory maximum. We don't have a violation there. So there's got to be a sentence out there that's not reasonable. But the question is, what is that? And your view is that Zavala is pretty critical to this. Well, I don't know that it's absolutely critical, but it does go a ways to assist everyone in understanding what place the sentencing guidelines have in all this. It doesn't answer – Well, what if – let's assume for a moment if Zavala is still a moving target. I'm not saying it is or it isn't, but let's just assume that there's kind of a process where something evolves and maybe the Zavala, as we know it at this point, isn't the Zavala that might be there when the defendant would be sentenced. But – so all of that, we're still – we're sort of in that process of trying to define. You know, I struggle with – I don't – you know, what – I think the government's frequently argued that the guidelines should be presumptive. Then we have the – we've got case law that says it's a starting point. I don't know. What does all that mean? Well, Your Honor, I don't know what it all means. But I can tell the Court that even looking at the undisputed facts in this case, setting aside everything that's termed aggravated that the Court may or may not have adopted as fact, a year-in-a-day sentence – and that's 10 months, really. It's the equivalent of 10 months. It's not a reasonable sentence. This isn't – and here's the undisputed facts that Chagger does not deny. He was a criminal defense lawyer, an officer of the court. Vartiya was arrested July 16th. She started to cooperate. She was a federal witness. The very next day and continuing for six weeks, Chagger had 26 phone calls with the leader of the drug organization. Those records are – were introduced into evidence. He became the lawyer for the co-conspirator in Canada. He obtained her post-arrest statements. He had them when he was arrested. He committed several ethics violations, violated the rules of ethics. He met with Vartiya behind the back of her counsel. The Court found that he knew full well that the counsel objected. He also met with co-defendants in the same case, three of them, violating the ethics rules. The Court's verdict, based on the verdict and in the language of the statute in the indictment, the Court found that Chagger either intimidated, threatened, or corruptly persuaded her, Vartiya, intending either to influence her testimony or preventing her from cooperating or both. Under the sentencing guidelines, he found that he abused his skills and position as an attorney to commit the crime, that he intended to obstruct a criminal case. And by rejecting the aberrant behavior downward departure request, which came very strongly at sentencing, he found that it didn't fit. There wasn't aberrant behavior here. Now, taking those facts and ignores everything else, all the taped statements, all the other testimony from Vartiya, throw it out the window. Just on that, with an officer of the Court marching into a federal prison, using his bar card to get in and trying to railroad and derail a prosecution in the United States and one in Canada all at the same time, it is not a sufficient sentence a year and a day. It doesn't address the seriousness of the crime, it doesn't provide adequate punishment, and it doesn't do anything for the deterrent value. This is an opportunity for the Court to take not only against lawyers, but against anyone who might tamper with a federal witness. Here's one that came forward, we proved it, and it was a lawyer who did it and an officer of the Court. This case, Your Honor. He was disbarred in Canada. Do you understand that he was disbarred? Has he been disbarred? Yes, Your Honor. He's been disbarred. For how long? Is it for life or for how long? Your Honor. Do you know anything about this? I do. And my understanding is that he has been temporarily disbarred pending an opportunity for him to, I guess, challenge that or present his side of the case in Canada. At the moment, it's just a temporary disbarment. That's my understanding. That's all I want to get the status. Thank you. What do you mean he's been temporarily disbarred? Well, what I understand from the Law Society in Canada is that he's currently prohibited from practicing law and that he will have an opportunity to present whatever side of the story he wishes to challenge that in an effort to gain his law license back. You say temporarily disbarred. I guess suspended would be a ---- Well, temporarily suspended, what does that mean? Six months, eight months, ten months? I think he's ---- A year, two years. Actually, I don't know. I believe he is currently suspended from practicing law and that when he makes an effort to overturn that, he'll have that opportunity. In other words, you're suspended. You can't be a lawyer in Canada, but you can come back here and convince us that somehow, in some way, we ought to allow you to practice law in Canada. That's my understanding. Was he admitted to practice law in the state of Washington? No, Your Honor. He is admitted to practice law in the country of England. Where? England. Just England? Yes, Your Honor. England and Canada. England and Canada. Has he been suspended in England? Not that I know of. Has he been suspended in England? Not that I know of, Your Honor. With the Court's permission, I'll reserve my last minute for rebuttal. Where did he go to law school? Sorry, Your Honor? Where did he go to law school? Somewhere in England. I don't know the school. Okay. Your Honor, under Zavala and also Mohamed, which was decided Friday of last week, what the district court is supposed to do at sentencing is figure out the guideline range correctly, consider the 3553A factors, and impose sentence. That's exactly what the district court did here. And if you take a look at ER 306, I think it shows the judge doing that. The government makes a big deal out of this 88 percent departure as if it's presumptively unreasonable as a departure or as if the magnitude of it is something special. Well, post-Zavala and post-Mohamed, it's not a departure at all, and it doesn't get looked at with a jaundiced eye to start with. But even more than that, if Zavala and Mohamed are moving targets, let me call your attention to some other earlier cases where departures of greater magnitude than that have been upheld by this court. Well, let me ask you this, though. If the standard is reasonableness, obviously there's got to be a sentence out there that's unreasonable. Absolutely. And the question is to find the high and the low watermarks, which we haven't, you know, I mean, no one really has a lot to compare with right now. But let's say that we looked at certain things here and said, in this situation, the facts in this case where a lawyer goes into a prison would not otherwise be able to do that, would not, it's not like, you know, could not get in but for using the bar card. Correct. And talks to someone else's client, is representing other people, and in those sort of circumstances, how could that ever be a mitigating? Well, that's not the mitigating factor. The other stuff is the mitigating factors. The government has called, has characterized this as a case with two potential mitigating factors. One, his loss of professional status, and two, the closeness of the case. I don't think that's a fair characterization of the record. Wrapped up in that professional status loss was the district court's consideration of Mr. Chigar's prior history of service. The fact that he had done all these things for his community and had often done them pro bono. Wrapped up in the closeness of the case was the fact that the judge said, I reject the government's aggravated view of this case as presented in the pretrial briefs. Well, that's perfectly, I understand that. You can say, you know, I don't think the fact that it was closed before he was found guilty goes anywhere. I agree. But the fact that not every conviction is, you can be convicted of a battery where you break someone's nose and you can be convicted of a battery where you touch their sweater. Right. And forgive me for interrupting, but the government charged this as a crime that continued from the 13th to the 18th of September. And its theory of the case was that he was planning it out for two months and planning it as he drove down the I-90 corridor, stopped at one of Mark Mistel's offices to pick up the discovery and continued on to the FDC. That was its view of the case. That's not necessarily what the district court found. It only had to find one act of tampering in order to convict beyond a reasonable doubt. So this is also a crime that could be done in many different ways. If you look at the nature and circumstances of the offense, 3553A1, that becomes relevant. So tampering could have been going to the lawyer's office? No. But the government argued that this was a premeditated crime that was planned for several months. When they list for you the fact that Mr. Chigar was receiving calls from other members of the drug conspiracy, what they're arguing is their theory of the case, that this lasted over a month and that he was making a premeditated effort to tamper with Ms. Vartiya. That's not necessarily what the district court found. He could have convicted this lawyer if once in that visit on September 13th he believed that there was a threat or an intimidation. So there's several different views of this case. And this is not necessarily the most aggravated case. In fact, what we have from the district court is that it was the least aggravated case. And that's considered. But what evidence, Ms. McLeod, what evidence is there of his professional standing being affected? Of his professional standing being affected? That he lost his license to practice in Canada. Has he lost it or is it temporarily suspended or what is it? I don't know the answer to that, Your Honor, and the record is silent. We don't know? Do we know anything? Yes, we know that. The judge made a lot of it, but do we know what happened to him? You don't know? If you don't know, nobody knows. Correct, but we know that. What about England? Has he been suspended in England? I don't know, and the record is silent on that, Your Honor. Well, I mean, those are facts that Judge Kuhn and I were imagining, but they're not in the record. Well, the fact that he's not able to. He hasn't lost his what? The fact that he's not able to. He hasn't lost his profession in England, as far as we know. I don't know, Your Honor. Well, I mean, that was part of the mitigating circumstances, according to the judge. I mean, how can, I mean, you could, I don't care about what the guidelines say, but I do care about reasonableness. And this man, once you resolve the credibility thing, he committed a monstrous crime. He could, he was. He really did something awful, and to say that's a reasonable sentence makes no sense at all. Well, let me go over some sentences in other cases, pre-Zavala and post-Zavala, that have had departures that were of greater. He was handling with a federal witness? They were not. Threatening with a federal witness in the prosecution? They were not. That's what we're looking at. No, actually, what I'm looking at here is at the 88 percent departure and trying to argue that that's. Oh, forget that. I'm just looking at this kind of crime by a lawyer. It's a betrayal of his profession. It's a serious intrusion into the criminal justice system. And it can't be sustained as reasonable. Well, but a guideline sentence is not always presumptively reasonable. Don't argue that to me. I'm just asking you to be reasonable about it. Well, to be reasonable about it, I think we consider not only the crime, but also the history and the characteristics of the individual, the seriousness of this offense, that's 2A, 3553-2A, and deterrence and protection of the public. Deterrence and protection of the public is already being accomplished by the fact that he won't be practicing law, by the fact that there's bar proceedings. We don't know that. We do know that there's. That's not in the record. It is in the record. You don't know it. You don't know it. We don't know it. It is in the record that there's bar proceedings against him, the resolution of those proceedings. Oh, yeah, but we don't know. We don't know how the Canadian bio will handle it. You don't know it. You don't tell us. The record is silent about that, Your Honor. Unless there are other questions, I'm considerably over my time. Thank you for your comments. Okay. Any rebuttal? No, Your Honor, unless there are questions. Any questions, Judge Nuna? No, thanks. I don't think so. No, thank you. All right. Thank you very much, and very informative discussion. And the court will recess until 9 a.m. tomorrow morning. I'll stay on the camera with you if you're going to stay in the courtroom. Oh, yeah, we have to clear the courtroom. We'll switch over. All right. Oh, we have another one? Yes. Okay. We've got a fallback position. The court for this session stands adjourned. Okay. Thank you. Thank you.
judges: Pregerson, Noonan, Callahan